**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **Bentoli, Inc.** | § | |
| | § | **Case No. 23-10827** |
| | § | **SubChapter V** |
| **Debtor** | § | |

**DEBTOR'S MOTION PURSUANT TO SECTIONS 105(A), 363(B), AND 503(B)(9)**
**OF THE BANKRUPTCY CODE TO AUTHORIZE DEBTOR TO**
**HONOR PRE PETITION CHECKS *NUNC PRO TUNC***

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**THIS PLEADING REQUESTS RELIEF THAT MAY BE ADVERSE TO YOUR
INTERESTS. IF NO TIMELY RESPONSE IS FILED WITHIN TWENTY ONE (21) DAYS
FROM THE DATE OF SERVICE, THE RELIEF REQUESTED HEREIN MAY BE
GRANTED WITHOUT A HEARING BEING HELD. A TIMELY FILED RESPONSE IS
NECESSARY FOR A HEARING TO BE HELD.**
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Bentoli, Inc., the debtor and debtor in possession (the "Debtor" or "Bentoli") in the

above-captioned Chapter 11 case (the "Case") submits this Motion to *Nunc Pro Tunc* Authorize

Debtor to Honor Pre Petition Checks (the "Motion") pursuant to sections 105(a), 363(b), and

503(b)(9) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 and represents as

follows:

**Jurisdiction and Venue**

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 1334

and 157. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and (O). Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Procedural Background**

2.      The Debtor filed this Case on October 1, 2023 (the "Petition Date"). Debtor elected for this Case to proceed under Subchapter V of chapter 11. The Debtor continues to manage its financial affairs as debtor in possession.

3.      A hearing on first day relief was conducted on October 5, 2023, and included a request for authorization to (a) maintain bank accounts [ECF No. 7] (granted at ECF No. 36), and (b) use of cash collateral at docket number 6 (granted at ECF No. 75).

4.      Debtor filed its Plan of Reorganization on October 1, 2023 [ECF No. 3] (the "Plan"). A Plan Confirmation Hearing is set for November 30, 2023.

## Background

5.      A detailed description of the Debtor's business, its capital structure, and the circumstances leading to the commencement of the Case can be found in the *Declaration of John C. Robinson in Support of the Debtor's Chapter 11 Petition and First Day Motions* [ECF No. 2].

6.      Debtor issued 33 checks to vendors from its Independent Bank Account in the two weeks before filing its bankruptcy case (the "**Checks**") that did not clear before the Petition Date which have led to $151,147.39 in funds clearing the Independent Bank Account after the Petition Date.  There was a miscommunication between the Debtor and its financial advisor regarding the reconciled bank balance as of the petition date.  The Debtor believed the reconciled balance was on a pro forma basis, taking into account checks that had not been issued but not yet negotiated. In contrast, the financial advisor believed that a reconciled bank balance reflected checks that had been negotiated. This miscommunication was discovered while Debtor prepared its October monthly operating report.  The Debtor reflected in schedule A/B that the bank balance was $4,482.47 as of the Petition Date on a pro forma basis, but should have been $156,932.39 to take into account the checks that had not yet cleared.  The Checks were negotiated after the Petition

Date. Debtor would have sought the relief requested in this Motion at the outset of this case but for this miscommunication.

7. The majority of the checks by dollar amount were issued to pay (i) critical vendors, (ii) for future services, (iii) for Debtor's rent, and otherwise make payments in the ordinary course of debtor's business. The remaining 22 checks, all of which were issued for $750 or less, totaled $6,523 and were issued in the ordinary course of business. Therefore, Debtor is requesting the Court *nunc pro tunc* to authorize the Debtor to honor the Checks effective as of the date they were honored.

## Relief Requested

8. By this Motion, pursuant to sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtor requests authority, but not direction, to in the exercise of its reasonable business judgment to honor the Checks in (a) amounts owed to critical vendors whose goods and services are essential to the Debtor's operations (the "**Critical Vendor Payments**"), (b) lease payment to Debtor's Landlord (the "**Lease Payment**"), (c) amounts paid in the ordinary course of Debtor's business (the "**Ordinary Course of Business Payments**"), (d) amounts paid for subscription software services (the "**Software Subscription Payments**"), (e) amounts paid to Viteri Financial Corporation for tax services (the "**Viteri Payments**"), and (f) amounts beneath the Administrative Convenience Claim threshold (the "**Administrative Convenience Payments**").

## Bases for Relief Requested

9. The issue date, payee, and amount of each of the Checks is listed below, along with the category in which each Check falls:

3

| Check Issue Date | Payee | Amount |
|---|---|---|
| **Critical Vendor Payments** | | |
| 09/26/2023 | Critical Vendor "A" | 71,034.69 |
| 09/26/2023 | Critical Vendor "B" | 28,864.00 |
| 09/29/2023 | Critical Vendor "C" | 12,507.00 |
| 09/26/2023 | Critical Vendor "C" | 1,444.00 |
| **Lease Payments** | | |
| 09/26/2023 | 116 Hoxie.LLC | 8,487.00 |
| **Software Subscription Payments** | | |
| 09/18/2023 | Quick Base | 7,200.00 |
| 09/18/2023 | Hub Spot | 1,726.92 |
| **Viteri Payments** | | |
| 09/27/2023 | Viteri Financial Corporation | 5,760.00 |
| **Ordinary Course of Business Payments** | | |
| 09/26/2023 | SAIA Motor Freight Line, Inc. | 3,851.60 |
| 09/27/2023 | Summit Eleven Inc. | 3,750.00 |
| **Administrative Convenience Payments** | | |
| 08/11/2023 | Texas Grain & Feed Association | 750.00 |
| 09/08/2023 | SAIA Motor Freight Line, Inc. | 722.11 |
| 09/26/2023 | Fairview Mills | 656.25 |
| 09/08/2023 | Quill Corporation | 616.91 |
| 09/26/2023 | Spectrum Enterprise | 498.26 |
| 09/26/2023 | Colonial Life & Accident Insurance Co. | 436.80 |
| 09/26/2023 | Waste Management of Austin | 411.87 |
| 09/26/2023 | Waste Management of Austin | 400.00 |
| 09/26/2023 | Colonial Life & Accident Insurance Co. | 349.44 |
| 09/26/2023 | AT&T MOBILITY | 319.29 |
| 09/26/2023 | Quill Corporation | 295.53 |
| 09/27/2023 | TASC | 243.62 |
| 08/18/2023 | Spectrum Enterprise | 219.37 |
| 09/26/2023 | Federal Express | 130.72 |
| 09/26/2023 | Zoro Tools | 128.45 |
| 09/26/2023 | AT&T Voices  Over IP | 107.19 |
| 09/27/2023 | Federal Express | 76.78 |
| 08/18/2023 | TASC | 62.92 |
| 09/27/2023 | Texas Feed & Fertilizer Control Service | 56.94 |
| 09/26/2023 | The Bug Master | 22.73 |
| 09/26/2023 | Texas Welding Supply | 8.50 |
| 09/08/2023 | Texas Welding Supply | 8.50 |
| | Total: | **151,147.39** |

I.    **Critical Vendor Payments Should be Approved Because They Preserve Debtor's Estate by Preventing Significant Harm to Debtor's Operations**

10.    The relief requested in this motion is appropriate under section 363(b) of the Bankruptcy Code, which provides that a debtor may, in the exercise of its sound business judgment and after notice and a hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992) (holding a court may approve an application under section 363(b) upon a showing of a good business reason for the disposition). In *In re Kmart Corp.,* the 7th Circuit expressed concern with the unfettered discretion the bankruptcy court placed in Kmart to pay critical vendors without proper evidentiary support. *In re Kmart Corp*. 359 F.3d 866, 871 (7th Cir. 2004), cert. denied, 125 S.Ct. 495 (2004).

11.    Although the 7th Circuit did not approve the critical vendor treatment Kmart desired, it did not prohibit critical vendor orders altogether. Instead, it noted that "[e]ven if § 362(b)(1) [sic] allows critical-vendors orders in principle, preferential payments to a class of creditors are proper only if the record shows the prospect of benefit to the other creditors." *In re Kmart Corp*, 359 F.3d at 874. Although the 7th Circuit did not have to decide whether section 363(b)(1) could support payment of certain pre-petition debts, it noted that "it is prudent to read, and use, § 363(b)(1) to do the least damage possible to priorities established by contract and by other parts of the Bankruptcy Code." *In re Kmart Corp*., 359 F.3d at 872.

12.    Here, Debtor addresses critical vendor status in a measured and narrow approach, seeking such payment only to a very small number of highly necessary vendors, Critical Vendor

A, Critical Vendor B, and Critical Vendor C.[1] As this Court knows, Debtor is in the business of making and distributing large-scale specialty livestock feed additives. The Debtor believes the goods and services supplied by Critical Vendors A, B, and C are critical to Debtor's operations because Debtor's business could not continue to operate without access to such goods and services.

13.     The delay that would be caused by locating, contracting, and changing to substitute suppliers to replace Critical Vendors A, B, and C would cause tens of thousands of dollars of orders to be delayed and likely would cause Debtor to lose customers. Debtor does not have alternate suppliers for these three critical vendors.

14.     Without the Critical Vendors, Debtor faces a significant risk of almost certain disruption to its operations, loss of revenue, and loss of customers impacting future revenue. Accordingly, Debtor believes payment of the prepetition claims of the above critical vendors will benefit all creditors because payment will allow the Debtor's business to operate in an efficient manner, preserve its going concern value, and outweigh the amount of such vendor's prepetition claims. For these reasons, the Court should authorize Debtor to honor the Critical Vendor Payments.

**II.     Debtor's Lease Payment Should be Approved as an Administrative Claim.**

15.     Debtor issued its October rent payment to 116 Hoxie, LLC on September 26, 2023, for use of the property located at 116 Hoxie. These premises serve as Debtor's offices and production grounds, and Debtor would not be able to currently conduct business without this

---

[1] The names and functions of each critical vendor Debtor seeks to authorize payment to herein constitute proprietary information that Debtor cannot disclose publicly. For the purpose of this Motion, Debtor has identified the critical vendors as Critical Vendor A, Critical Vendor B, and Critical Vendor C. Debtor can provide more detailed information regarding each critical vendor and their roles in Debtor's operations directly to the United States Trustee and the Sub V Trustee upon request.

property. Additionally, the rent payment became due and payable as an administrative expense on October 1, 2023, the date of Debtor's bankruptcy filing. For these reasons, the Court should authorize Debtor to honor the Lease Payment.

**III. Software Subscription Payments Should be Authorized as Necessary Ongoing Business Operation Expenses That Provide Significant Benefit to the Estate.**

16. Debtor makes ongoing payments to Hubspot and Quickbase to access and use their CRM software services, which are necessary to Debtor's business operations. Debtor should be authorized to continue making subscription payments to Hubspot and Quickbase for the continued use of the software. Without these services, Debtor's internal operations and data management will be significantly disrupted if not halted altogether—ultimately harming Debtor's estate. For these reasons, the Court should authorize Debtor to honor the Software Subscription Payments.

**IV. Debtor's payment to Viteri Financial Corporation ("Viteri") should be approved because it was a contemporaneous exchange for new value and Viteri's claim is an administrative claim.**

17. Debtor hired Viteri to prepare its 2022 tax return. Viteri required payment from Debtor prior to filing the return. Debtor issued its payment to Debtor on September 27, 2023, and then Viteri filed the tax return on October 1, 2023.

18. Viteri's claim satisfies the contemporaneous exchange rule because his work was "new work" and his agreement to file the tax return was in exchange for Debtor issuing payment. Moreover, Viteri filed the return after the bankruptcy case was filed and, therefore, also qualifies as an administrative expense. For these reasons, the Court should authorize Debtor to honor the check issued to Viteri.

**V. Ordinary Course of Business Payments Should be Approved Because they Encourage the Continuation of Business**

19.     The ordinary course defense "is intended to protect recurring, customary credit transactions" that are incurred and paid in the preference period for the purpose of encouraging the continuation of business. *G.H. Leidenheimer Baking Co. v. Sharp (In re SGSM Acquisition Co., LLC)*, 439 F.3d 233, 240 (5th Cir. 2006). To determine whether debts were incurred in the ordinary course of business, "Courts examine the underlying debt for the normality of such occurrences in each party's business operations generally." *FBI Wind Down, Inc. Liquidating Trust v. All American Poly Corp.*, (*In re FBI Wind Down, Inc.*), 581 B.R. 116, 138 (Bankr. D. Del. 2018). For any particular payment to qualify as ordinary, it must be consistent with the timing of other transactions. *Zayler v. Miken Oil, Inc. (In re Slamdunk Enters.)*, Nos. 17-60566, 18-6006, 2021 Bankr. LEXIS 206, at *64 (Bankr. E.D. Tex. 2021).

20.     Here, just as the name implies, each Ordinary Course of Business Payment was incurred through Debtor's ordinary course of business.

21.     SAIA Motor Freight Line, Inc. and Summit Eleven, Inc. are both freight operators who routinely transport Debtor's livestock feed additives to Debtor's customers. The payments are "ordinary" because they are made on a consistent and regular basis: Debtor requests the freight service, the provider issues an invoice, and within a short period of time, Debtor tenders payment.

22.     Nonpayment of the Ordinary Course of Business Payments would stall Debtor's distribution of its product and ultimately harm Debtor's estate.  For these reasons, the Court should authorize Debtor to honor the checks issued to the freight operators.

**VI.     The Administrative Convenience Payments Should be Approved Because the Cost of Recovery and Investigation Outweighs the Benefit of Payment**

23.     The remaining 22 checks, all of which were issued for $750 or less, totaled $6,523 and were either issued in the ordinary course of business or the cost of collection would be an

excessive burden on the estate. To the extent any of these checks would not qualify to be paid pursuant to the exemptions requested above, the cost of investigation and collection would far outweigh any benefit to the estate.[2] For these reasons, the Court should authorize Debtor to honor the checks issued to those companies that received administrative convenience payments.

VII.  **Liminality Ventures, LLC Consents to the Use of Cash Collateral to Fund the Honored Checks.**

24.  Debtor's counsel has consulted with Counsel for Liminality Ventures, LLC, and Liminality Ventures, LLC consents to the use of its cash collateral to fund the honored checks discussed herein.

WHEREFORE, Debtor respectfully requests that the Court enter an Order granting Debtor (i) authority, but not direction, to pay prepetition amounts, in the exercise of its reasonable business judgment subject to the terms of the Proposed Orders (a) amounts owed to critical vendors whose goods and services are essential to the Debtor's operations, (b) lease payments to Debtor's landlord, (c) amounts paid in the ordinary course of Debtor's business, (d) amounts paid for software subscription services, (e) amounts paid to Viteri Financial Corporation for tax services, and (f) amounts beneath the Administrative Convenience Claim threshold and (ii) grant Debtor all other relief it is justly entitled.

Dated:  November 11, 2023

---

[2] Similarly, Debtor's Plan includes an administrative convenience claim election wherein any creditor with a claim worth $2,000 or less can elect to accept $2,000 as full and final payment of their claim. In the case of the 22 checks, they all are less than half of the maximum administrative convenience claim.

Respectfully Submitted,

THE SMEBERG LAW FIRM, PLLC

By:＿＿ /s/ *Ronald J. Smeberg*

RONALD J. SMEBERG
State Bar No. 24033967
THE SMEBERG LAW FIRM, PLLC
4 Imperial Oaks
San Antonio, TX 78248
210-695-6684 (Tel)
210-598-7357 (Fax)
ron@smeberg.com
ATTORNEY FOR DEBTOR